IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LUXER CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 24-603-CFC |
| | ) | |
| PACKAGE CONCIERGE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

*Of Counsel:*

Benjamin T. Horton
Tiffany D. Gehrke
Ray Ricordati
Chelsea Murray
Christopher J. Hall
MARSHALL, GERSTEIN
  & BORUN LLP
233 S. Wacker Drive
6300 Willis Tower
Chicago, Illinois 60606
(312) 474-6300
bhorton@marshallip.com
tgehrke@marshallip.com
rricordati@marshallip.com
cmurray@marshallip.com
chall@marshallip.com

Dated: July 11, 2024

Andrew C. Mayo (#5207)
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
amayo@ashbygeddes.com

*Attorneys for Defendant*

{02033971;v1 }

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................1

II.   BACKGROUND ................................................................................3

III.  LEGAL STANDARDS ........................................................................3

IV.   ARGUMENT......................................................................................6

    A.   Claim 1 of the '675 Patent Is Representative for the Purposes of
        Section 101 ..............................................................................6

    B.   *Alice* Step One: The '675 Patent Claims Are Drawn to
        Unpatentable Subject Matter ................................................7

    C.   *Alice* Step Two: The '675 Patent Does Not Recite an Inventive
        Concept...................................................................................12

        1.   The '675 Patent itself does not support the presence of an
            inventive concept ......................................................13

        2.   Applicant's claims of improvements during prosecution
            of the '675 Patent are insufficient, and the Court need not
            defer to the Examiner's allowance...........................15

    D.   No Claim Construction or Other Factual Issue Precludes
        Dismissal ...............................................................................21

V.    CONCLUSION.................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   882 F.3d 1121 (Fed. Cir. 2018) .......................................................................23

*Affinity Labs of Texas, LLC v. DIRECTV, LLC*,
   838 F.3d 1253 (Fed. Cir. 2016) .......................................................................10

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
   573 U.S. 208 (2014)......................................................... 2, 5, 6, 9, 14, 15, 17

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...........................................................................................4

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
   569 U.S. 576 (2013)...........................................................................................5

*BASCOM Global Internet v. AT&T Mobility LLC*,
   827 F.3d 1341 (Fed. Cir. 2016) .......................................................................16

*Belkin Int'l, Inc. v. Kappos*,
    696 F.3d 1379 (Fed. Cir. 2012) ......................................................................23

*Bell Atl. Corp v. Twombly*,
   550 U.S. 544 (2007)...........................................................................................4

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018) ....................................................................7, 9

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
   859 F.3d 1352 (Fed. Cir. 2017) ................................................................. 7, 24

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
   776 F.3d 1343 (Fed. Cir. 2014) ................................................................. 7, 22

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
   880 F.3d 1356 (Fed. Cir. 2018) .........................................................................5

*Credit Acceptance Corp. v. Westlake Servs.*,
   859 F.3d 1044 (Fed. Cir. 2017) .......................................................................17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Diamond v. Diehr*,
    450 U.S. 175 (1981)..........................................................................21

*Elec. Power 19 Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016) .......................................................7

*Genetic Techs. Ltd. v. Merial LLC*,
    818 F.3d 1369 (Fed. Cir. 2016) .......................................................6

*In re Jobin*,
    811 F. App'x 633 (Fed. Cir. 2020)..................................................13

*In re Rockefeller Ctr. Prop., Inc. Sec. Litig.*,
    311 F.3d 198 (3d Cir. 2002) ............................................................4

*Intellectual Ventures I LLC v. Symantec Corp.*,
    838 F.3d 1307 (Fed. Cir. 2016) ................................................. 7, 20

*Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*,
    566 U.S. 66 (2012)................................................................... 15, 16

*Sanderling Mgmt. Ltd. v. Snap Inc.*,
    65 F.4th 698 (Fed. Cir. 2023) ................................................. 22, 24

*SAP Am., Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018) .......................................................6

*Simio, LLC v. FlexSim Software Prod., Inc.*,
    983 F.3d 1353 (Fed. Cir. 2020) .....................................................21

*Smart Sys. Innovations, LLC v. Chicago Transit Auth.*,
    873 F.3d 1364 (Fed. Cir. 2017) .......................................................9

*Synopsys, Inc. v. Mentor Graphics Corp.*,
    839 F.3d 1138 (Fed. Cir. 2016) .......................................................8

*Trinity Info Media, LLC v. Covalent, Inc.*,
    No. 2022-1308, 2023 WL 4536366 (Fed. Cir. July 14, 2023) ................. 5, 21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Ultramercial, Inc. v. Hulu, LLC,*
    772 F.3d 709 (Fed. Cir. 2014) ...................................................................... 9, 10

*Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.,*
    916 F.3d 1363 (Fed. Cir. 2019) .....................................................................14

*Weisner v. Google LLC,*
    51 F.4th 1073 (Fed. Cir. 2022) .......................................................................5

**Statutes**

35 U.S.C. § 101 ............................................................... 3, 4, 12, 15, 16, 17

**Rules**

Fed. R. Civ. P. 12(b)(6)...............................................................................2, 4

## I.   INTRODUCTION

By the 19th century, the concierge was a common profession in Europe and around the world, born out of the tourist trade made possible by the advent of passenger trains and steamships. Concierges, in hotels and luxury apartment buildings, arranged for dinner reservations and theater tickets, monitored the comings and goings of tenants and guests, and received and delivered packages. Many believe the concierge originated hundreds of years prior, because the word concierge is a contraction of the French "comte des cierges," or "keeper of the candles," suggesting concierges would have worked in medieval castles to keep them well-lit.



Luxer Corporation ("Luxer") has filed this lawsuit against its direct competitor, Package Concierge, Inc. ("PCI"), asserting that PCI's electronic storage

lockers infringe at least one claim of U.S. Patent 11,625,675 (the '675 Patent), titled "Method and System for Controlling A Storage Room." But patent law protects only concrete and tangible inventions, not abstract ideas, even when those ideas are claimed in a particular context or in connection with conventional computer technology. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 223 (2014). Luxer's claims of patent infringement must fail at the outset, because the claims of the '675 patent violate this principle and are therefore invalid under 35 U.S.C. § 101.

The claims of the '675 Patent are directed to the abstract idea of authorizing access to a secure location upon verification of a user's credentials—in this case, unlocking a package delivery room—something deliverymen, building concierge staff, and delivery recipients have done for decades before the issuance of Luxer's purported invention. The claims of the '675 Patent also fail to offer any technical innovation or solve a technical problem. Rather, the claims merely recite a procedure for the secure, semi-automated process of requesting admission to a secure room, verifying access credentials, and unlocking the room upon verification. While that process is buried amongst jargon-heavy paragraphs, the claims amount to nothing more than a script by which deliverymen and package receivers gain access to a locked room, automating the human interaction involving secure package delivery.

## II.   BACKGROUND

Package Concierge sells and installs a range of parcel delivery products in living communities nationwide, including indoor parcel lockers, outdoor lockers, and access-controlled package rooms. PCI's products provide its customers with automated locker solutions allowing for convenient drop-off and retrieval of parcels, 24/7 package access, and extra security to prevent stolen mail.

Luxer Corporation is the owner of the '675 Patent, which issued April 11, 2023. Following issuance of the '675 Patent, on May 20, 2024, Luxer asserted the patent against three entities involved in parcel delivery solution technology in the District of Delaware—ButterflyMX, Inc. (Case No. 1-24-cv-00602), Parcel Pending, Inc. (No. 1-24-cv-00604), and PCI. All three actions remain pending.

Luxer alleges that PCI infringes the '675 Patent, directly and indirectly, through the sale and use of its access-controlled package room products. Because the '675 Patent claims unpatentable subject matter pursuant to 35 U.S.C. § 101, the patent is invalid, and Luxer's claims fail as a matter of law.

## III.   LEGAL STANDARDS

Under Rule 12(b)(6), a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007)). That claim must be supported by factual allegations and information that amounts to "more than labels and conclusions, [because] a formulaic recitation of the elements of a cause of action will not do." *Bell*, 550 U.S. at 555. In assessing the plausibility of a claim, a court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *In re Rockefeller Ctr. Prop., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3d Cir. 2002). When deciding a Rule 12(b)(6) motion, courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft*, 556 U.S. at 678.

Section 101 of the Patent Act provides that "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" is patent eligible.  35 U.S.C. § 101.  However, the Supreme Court has long interpreted 35 U.S.C. § 101 to include implicit exceptions: "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 573 U.S. at 216 (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)).

Courts follow a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 573 U.S. at 217. As a first step, courts must "determine whether the claims at issue are directed to a patent-ineligible

concept." *Id* at 218. Abstract ideas like methods of organizing human activity are patent-ineligible. *Weisner v. Google LLC*, 51 F.4th 1073, 1083 (Fed. Cir. 2022) ("[O]rganizing human activity like the creation of a travel log on a computer does not bring the claims out of the realm of abstractness."); *see also Trinity Info Media, LLC v. Covalent, Inc.*, No. 2022-1308, 2023 WL 4536366, at *8 (Fed. Cir. July 14, 2023). If the claims are not directed to a patent-ineligible concept, "the claims satisfy § 101 and [the court] need not proceed to the second step." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018). If, however, the court finds that the claims at issue are directed to a patent-ineligible concept, the Court must then, at Step Two, search for an "inventive concept"—that is, "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 573 U.S. at 217–18.

A district court may resolve the issue of patent eligibility under 35 U.S.C. § 101 at the Rule 12(b)(6) stage. *See, e.g.*, *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018) (stating that patent eligibility "may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion"); *Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369, 1373 (Fed. Cir. 2016) ("We have repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion.").

## IV.    ARGUMENT

### A.    Claim 1 of the '675 Patent Is Representative for the Purposes of Section 101

Courts may treat a claim as representative when analyzing eligibility. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018) (citing *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1352 (Fed. Cir. 2016); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316 & n.9 (Fed. Cir. 2016)). Courts have held that where claims are "substantially similar and linked to the same" abstract idea, analyzing a representative claim is proper. *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017) (citing *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1348 (Fed. Cir. 2014)).

The Court should treat Claim 1 of the '675 Patent as representative, as it is substantially similar to the remaining claims and linked to the same abstract idea of authorizing access to a secure location upon verification of a user's credentials. The remaining independent claims (Nos. 2, 5, 6, 7, 19, and 20) each recite only insignificant variants of the claimed system of Claim 1 without providing any distinct or significant difference. Because "the relevant question is whether the patent's other claims … meaningfully differ from the alleged representative claim[,]" *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016) ("The § 101 inquiry must focus on the language of the Asserted Claims

themselves."), PCI attaches as Appendix A, side-by-side comparisons of each additional independent claim of the '675 Patent, compared against representative Claim 1. Each independent claim merely adds well-known, conventional components (Claim 2 claims "a power source," "a receiver," and "one or more capacitors," for instance) or rewords claim limitations present in Claim 1 (Claim 20 claims "stored data" rather than "data stored in the lock interface" as seen in Claim 1, for instance). Luxer cannot "present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim[,]" and therefore the Court can (and should) treat Claim 1 as representative. *Berkheimer*, 881 F.3d at 1365.

Likewise, the dependent claims add only minor, well-known structural or functional features such as, for example, "an electric striker" (dependent claim 8), "storage receptacles … within the storage room" (12, 13), and "a capacitive filter" (25, 26). During prosecution of the '675 patent, the Applicant stated that "each of the recited components of [certain pending dependent claims] improve the functioning of the system." March 19, 2021 Applicant Response to Office Action at p. 20.

### B.    *Alice* Step One: The '675 Patent Claims Are Drawn to Unpatentable Subject Matter

Step One of *Alice* focuses on determining the abstract idea at the "heart" of the claims. *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714 (Fed. Cir. 2014).

To do so, courts query whether the claims "focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *Smart Sys. Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1371 (Fed. Cir. 2017) (citations omitted). The '675 Patent claims are directed to the latter. Step One analysis should not focus on excess verbiage or implementation details, but instead focus on the "concept embodied by the majority of the limitations." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014; *see also Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1256 (Fed. Cir. 2016).

The '675 Patent explains its premise in thirteen words. '675 Patent Specification, 3:55–56 ("a system in which packages are delivered and retrieved from a storage room."). The heart of Claim 1 of the '675 Patent boils this system down to nothing more than an apartment building concierge's script: ***receive*** a request to unlock a door; ***authenticate*** the user seeking access; ***approve*** the request upon authentication; and ***cause*** the lock to unlock or ***indicate*** that the user failed authentication, as highlighted in the colored limitations below:

> 1. A system comprising:
>
> at least one electronic lock for locking a door of a storage room that is stationary and part of a building, the storage room being large enough to accommodate packages that are small, medium, and oversized;

a lock interface that is communicatively coupled to the at least one electronic lock, the lock interface having at least one processor that implements one or more machine instructions stored on at least one non-transitory computer readable medium;

wherein the one or more machine instructions, when implemented, cause the processor of the lock interface to implement a method including at least

receiving, at the lock interface from a terminal, a first signal associated with a delivery, requesting access by unlocking the door;

in response, sending from the lock interface to the at least one electronic lock, a second signal including at least a request to open the door;

opening the electronic lock, based on the request, and allowing the access through the door, regardless of whether a storage area associated with the door is in use and regardless of whether the package is small, medium, or oversized;

wherein the request includes at least a user identity and a code, wherein the method further includes, after receiving the first signal including the request,

verifying, by the lock interface, the request by authenticating the user identity and the code received from the terminal;

approving the request, by the lock interface, after the user identity and the code are successfully authenticated;

in response to the approving of the request, sending the second signal, from the lock interface to the at least one electronic lock, the second signal causing the at least one electronic lock to automatically unlock, the at least one electronic lock including a circuit that includes at least

a signal input port that is communicatively connected to at least one signal output port of the lock interface;

an electronic switch that, in response to the receiving of signals from the lock interface, causes electric current to flow through the at least one electronic lock;

the step of **verifying**, by the lock interface, **the request** further including at least

**comparing**, by the lock interface, **the user identity and the code received from the terminal with data stored in the lock interface**;

**approving the request**, by the lock interface, **when the user identity and the code received match the data stored in the lock interface**, and

**rejecting the request**, by the lock interface, when at least one of the user identity and the code received does not match the data stored in the lock interface; and

in response to the rejecting of the request, **sending**, from the lock interface to the terminal, **a message indicating that the request is invalid**.

('675 Patent, Claim 1) (color and emphasis added).

The Abstract confirms the heart of the invention: "[a] system and a method for controlling a plurality of electronic locks" and describes that, in an embodiment, "a request for opening a door is received and verified. If the request is approved, signals are sent to open the electronic lock that locks the door. If the request is rejected, a message is sent to notify the user of the invalid request." This basic order of operations is further illustrated by Figure 5:



FIG. 5

('675 Patent, Figure 5) (color added). Such organization of human behavior is "a hallmark of claims directed to abstract ideas." *In re Jobin*, 811 F. App'x 633, 637 (Fed. Cir. 2020).

A 19th century concierge may be heartened to learn that his responsibilities to securely receive packages and verify the identity of users wishing to retrieve their parcels might span fifty-nine lines of a patent claim, though may be justifiably surprised that it is patentable at all. The Federal Circuit would agree, having confirmed that automation of such human behavior is an abstract idea. *Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019)

(finding patents automating manual process of medical data entry to claim unpatentable subject matter).

Granting access to a restricted area upon authentication of a person wishing to be admitted is not a new concept, whether in the package delivery context or otherwise. Office buildings regularly require tenants to "badge in" to gain admission to elevator banks, certain office floors, and specific offices. Concert venues and clubs maintain VIP lists for guests who, upon identification, may cut a line or gain backstage access. Here, the '675 Patent claims recite just such a verification and admission process, hedged as the electro-mechanical locking and unlocking of a storage room door with known, conventional components, in the context of package delivery. This concept of verification and admission is precisely the sort of abstract idea that fails to satisfy Step One of the *Alice* framework.

### C.   *Alice* Step Two: The '675 Patent Does Not Recite an Inventive Concept

Because the claims at issue are directed to the abstract idea of authorizing access to a secure location upon verification of a user's credentials, the Court must determine whether the claims recite an "inventive concept" (Step Two of the *Alice* framework). *Alice*, 573 U.S. at 221. An "inventive concept" is furnished by a recited element or combination of elements in addition to (beyond) the [abstract idea] and is sufficient to ensure that the claim as a whole amounts to significantly more than

the ineligible concept itself. *Id*. at 217–18 (citing *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66 at 72–73 (2012)).

### 1. The '675 Patent itself does not support the presence of an inventive concept

The elements of Claim 1 of the '675 Patent amount to nothing more than a set of instructions to apply the abstract idea of "authorizing access to a secure location" using a generic computer to perform generic computer functions—the type of computer-implemented procedure the Supreme Court found to be unpatentable in *Alice*. 573 U.S. at 225–26. Here, the "lock interface having at least one processor that implements one or more machine instructions stored on at least one non-transitory computer readable medium" embodies this addition of generic functions: The lock interface, for instance, "receiv[es] … a first signal"; send[s] … a second signal"; "verif[ies] … the request by authenticating the user identity"; and "open[s] the electronic lock," among other similarly generic procedural steps. *See* '675 Patent, Claim 1.

All of those claimed functions are "well understood, routine, conventional activities previously known to the industry" and are not enough to transform the '675 Patent's abstract idea into a patent-eligible invention. *Alice*, 573 U.S. at 225–26 (quoting *Mayo*, 566 U.S. at 79–80). A receptionist responsible for receiving packages and allowing access to a secure mail room would routinely verify a

person's credentials before admitting them to a mailroom or retrieving a secured package on their behalf.

Similarly, the electro-mechanical components of the '675 Patent, whether considered individually or in combination, do not rise to the level of an inventive concept. While "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces" (*BASCOM Global Internet v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016)), no such "non-generic arrangement" exists here. The '675 Patent claims elements such as "at least one electronic lock"; "a door"; "a storage room"; "computer readable medium"; "a lock interface," a "processer"; "a terminal"; "a signal input port"; "a signal output port"; and "an electronic switch," arranged in a conventional manner—a lockable room. *See* '675 Patent, Claim 1.

The '675 Patent's specification itself recognizes that each of these components are known and conventional. For example, the specification confirms that "typical" electronic locks and their uses are well-known: "Typically, use of a lock provides security and privacy to a storage room(s) or a storage area(s). This specification recognizes issues in controlling electronic locks." '675 Patent Specification, 1:51–54 (Background); "The electronic locks 103a-n may be any sort of locks including, but not limited to, one of, or any combination of, electronic locks that require a password or code to be opened." *Id*. at 6:18–21." The specification

similarly confirms the conventional nature of the other components making up Luxer's purported invention. *See*, *e.g.*, '675 Patent Specification, 17:26-33 ("computer readable medium"; "The term 'machine-readable medium' is used to refer to any non-transitory medium capable of carrying information that is readable by a machine. One example of a machine-readable medium is a computer-readable medium. Another example of a machine-readable medium is paper having holes that are detected that trigger different mechanical, electrical, and/or logic responses."); *see also* 16:59–64 ("lock interface"); 9:10–14 ("signals"); 13:33–39 ("processor"); 25:37–52 ("storage terminal").

The combination of the process steps described above, along with the combination of the electro-mechanical components claimed in the '675 Patent, result in only the automation of the human interaction of secure package delivery, which does not "amount[] to significantly more than the ineligible concept itself." *Alice*, 573 U.S. at 217; *see also Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017) ("[M]ere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology.").

> **2.    Applicant's claims of improvements during prosecution of the '675 Patent are insufficient, and the Court need not defer to the Examiner's allowance**

The '675 Patent has already faced scrutiny for its § 101 patentability issues, which the Examiner identified as grounds for rejection in the very first office action

levied against the '675 Patent's underlying application (U.S. Pat. App. No. 15/222,917). In that non-final rejection, the Examiner noted:

> The claims as a whole recite a method of organizing human activity … The mere recitation of generic computer components … and an additional element (Claim 5: automatically open, electronic locks) does not take the claim out of the certain methods of organizing human activity grouping. Thus, the claims recite an abstract idea.

(June 21, 2019 Examiner's Non-Final Rejection (Exhibit A) at pp. 6–7).

The Examiner went on to consider whether additional elements of the pending claims provided a practical application of the abstract idea or furnished an inventive concept upon the invention, finding that they did not:

> [T]he additional elements [] are merely invoked as a tool to perform the abstract idea; or do no more than generally link the use of the abstract idea to a particular technological environment or field of use (i.e., electronic locks) … [this] does not integrate the abstract idea into a practical application at Step 2A or provide an inventive concept at Step 2B. That is, even when viewed as a whole, nothing in the claim adds significantly more (i.e., an inventive concept) to the abstract idea.

(*Id*. at p. 14; *see also* pp. 4–14, *passim*).

The Examiner continued to raise similar rejections over each of Applicant's arguments through several additional rounds of uninspired prosecution spanning several years. *See* April 3, 2020 Examiner's Final Rejection  (Exhibit B) at pp. 2–5, 13–23; September 16, 2021 Examiner's Non-Final Rejection (Exhibit C) at pp. 3–7 (specifically noting that the application failed to show that "a person of ordinary skill

in the art would recognize that opening the storage room for oversized packages 'instead of forcing the delivery person to return the package' is a **technical improvement** to the electronic lock") (emphasis in original), pp. 13–16.

In support of the presence of a technical improvement to the claimed system, Applicant relied heavily on the recitation of a "storage room" instead of a "storage locker" and argued:

> [Pending] claim 1 recites a storage room, the locations for small, large, and oversized storage locations, which improves the system … In [prior art reference] (for example), the lockers do <u>not</u> open if the package is oversized, and the delivery person is forced to leave the package outside the security of the locker. The fact that the doors do <u>not</u> open is a technical problem, and the claims improve the system's functioning by solving this problem, which is facilitated by providing a storage room instead of a storage locker.

(January 5, 2022 Applicant Response to Non-Final Rejection (Exhibit D) at p. 21) (emphasis in original).

The Examiner subsequently found this argument, coupled with the Applicant's modifications to the claims (including formerly rejected pending claim 1, reproduced below), persuasive. March 30, 2022 Examiner's Non-Final Rejection (Exhibit E) at p. 3. That decision was in error.

Please replace the previously filed claims with the claims below.

1.   (Currently Amended) A method, comprising:

locking at least one door to a storage room, the at least one door having at least one electronic lock and the locking including automatically locking the electronic lock, the storage room, being stationary and the storage room being part of a building, and having storage locations for items that are small, medium, and oversized;

receiving, at the at least one electronic lock from a terminal associated with a delivery service, a signal including at least a request to open the at least one door to the storage room; and

in response to receiving the signal, automatically opening the at least one electronic lock, based on the request, and allowing access to the storage room, wherein the ~~storage room~~ at least one electronic lock automatically opens whether the ~~package~~ item is small, large, or oversized.

(January 5, 2022 Amendment to Pending Claim 1).

It is unclear what these claim amendments provided—if anything—as a sufficient basis to overcome the Examiner's rejection, especially in light of the substantially similar arguments raised by both the Examiner and the Applicant in prior office actions. Applicant argued, essentially, that the claims recite a technological innovation because they claim a *room* and not a *room with lockers*.

These elements do not constitute a technical improvement in the field—nor do they offer innovations over the prior art, although the Court need not consider novelty for purposes of § 101 analysis. *Intellectual Ventures*, 838 F.3d at 1315 (The "'novelty' of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter.") (quoting *Diamond v. Diehr*, 450 U.S. 175 at 188–89 (1981)). Here, the Applicant's cited limitations "improve" upon

imagined deficiencies in package delivery—a human concierge receiving a delivery would not be constrained by artificial restrictions such as categorizations of package size limiting their ability to unlock the package room door. "These conclusory allegations that the prior art lacked elements of the asserted claims are insufficient to demonstrate an inventive concept." *Trinity Info Media*, No. 2022-1308, 2023 WL 4536366, at *8 (Fed. Cir. July 14, 2023) (citing *Simio, LLC v. FlexSim Software Prod., Inc.*, 983 F.3d 1353, 1363 (Fed. Cir. 2020).

Applicant's later repeated arguments and subsequent amendments do not transform the formerly rejected claims into subject-matter eligible claims, and the Examiner's basis for rescinding its prior repeated § 101 rejections is ambiguous at best.

| Amended Pending Limitation | Examiner Action | Basis |
|---|---|---|
| … wherein the **storage room** automatically opens whether the **package** is small, large, or oversized. | rejected on § 101 grounds | No inventive concept |
| … wherein the **at least one electronic lock** automatically opens whether the **item** is small, large, or oversized. | allowed | **?** |

As described above, Applicant's argument that its storage locker improves upon the concept of secure package delivery circumvents common sense—concierge have successfully dealt with the handling of oversized packages for decades; claiming otherwise only serves to create a straw man through the invocation of

limitations in the art—not problems in the industry of package storage. Similarly, Applicant's claim amendments (recreated above) that served to overcome the Examiner's rejection do nothing to provide the requisite "something more" than the performance of "well-understood, routine, [and] conventional activities previously known to the industry." *Content Extraction & Transmission LLC*, 776 F.3d 1343 at 1347–48. The Examiner should not have treated them as such.

The Court also need not treat the issued claims of the '675 Patent as subject-matter eligible. Although a patent is presumed to be valid, "courts are not required to defer to Patent Office determinations as to eligibility." *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 705 (Fed. Cir. 2023). The question is whether the patent *as issued* suffers from eligibility defects, not whether the patent issued at all—the ultimate question of patentability of the '675 Patent is one for the Court to decide. *Belkin Int'l, Inc. v. Kappos*, 696 F.3d 1379, 1385 (Fed. Cir. 2012) ("Suffice it to say here that the courts have the final say on unpatentability of claims, not the PTO.").

No elements of Claim 1 of the '675 patent, whether considered individually or as an ordered combination, rise to the level of transforming the claim into a patent eligible application of the abstract idea. Accordingly, the '675 Patent is unpatentable under § 101.

### D.     No Claim Construction or Other Factual Issue Precludes Dismissal

Claim construction is not a prerequisite to a § 101 dismissal. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018). If there are any claim construction disputes, "the court must proceed by adopting the non-moving party's constructions or the court must resolve the disputes to whatever extent is needed to conduct the § 101 analysis." *Id*. The Federal Circuit has "repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery has commenced." *Cleveland Clinic Found.*, 859 F.3d at 1360.

"If claims are directed to ineligible subject matter under all plausible constructions, then the court need not engage in claim construction before resolving a Section 101 motion." *Sanderling Mgmt. Ltd.*, 65 F.4th at 704. "In aid of determining whether a particular motion requires claim construction before disposition of the motion, a district court is free to require the party asking for construction to provide an actual proposed construction, to demonstrate that its construction is not frivolous, and to articulate how adoption of the construction would materially impact the analysis at step one (and/or at step two)." *Id*.

No pertinent claim construction issues exist here because no plausible construction of any term in the '675 Patent would change the nature of the abstract

idea to which the '675 Patent is drawn, and no constructions would imbue an inventive concept unto the asserted claims.

## V.     CONCLUSION

For the reasons stated above, all claims of the '675 Patent are invalid under § 101 for lack of subject-matter eligibility. Accordingly, the Court should grant PCI's Motion to Dismiss.

ASHBY & GEDDES

*/s/ Andrew C. Mayo*

*Of Counsel:*

Benjamin T. Horton
Tiffany D. Gehrke
Ray Ricordati
Chelsea Murray
Christopher J. Hall
MARSHALL, GERSTEIN
  & BORUN LLP
233 S. Wacker Drive
6300 Willis Tower
Chicago, Illinois 60606
(312) 474-6300
bhorton@marshallip.com
tgehrke@marshallip.com
rricordati@marshallip.com
cmurray@marshallip.com
chall@marshallip.com

Dated: July 11, 2024

Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
amayo@ashbygeddes.com

*Attorneys for Defendant*

## <u>CERTIFICATION</u>

The undersigned hereby certifies that the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)** contains 4,704 words, excluding the cover page, tables, and signature blocks, and that it complies with the Court's type, font, and word limitations.

*/s/ Andrew C. Mayo*

_____

Andrew C. Mayo